Ronald NELSON and Michael Ferris, Plaintiffs,

v.

CITY OF FLINT and Trevor Hampton, Defendants.

No. 99–CV–74992–DT.

United States District Court, E.D. Michigan, Southern Division.

March 23, 2001.

Glen N. Lenhoff, Flint, MI, for plaintiff.

Edward L. Parker, Flint, MI, for defendant.

## OPINION AND ORDER REGARDING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

ROSEN, District Judge.

### I. INTRODUCTION

This Section 1983/Elliott–Larsen reverse discrimination action arises out of the allegations of Flint police officers Ronald Nelson and Michael Ferris that they were passed over for promotion to Sergeant three times, in 1996, 1997 and 1998, because they are white and/or male.[1] The matter is presently before the Court on the City of Flint's and Flint Police Chief Trevor Hampton's Motion for Summary Judgment. Plaintiffs have responded to Defendants' Motion to which Response Defendants have replied. The Court heard

---

1. Both Nelson and Ferris actually were promoted in 1998. However, they maintain that because they were not ranked higher in the order of the 18 promotions made in May and June of that year, they have, nonetheless, suffered adverse employment actions.

the oral arguments of counsel at on December 14, 2000. At the close of the hearing, the Court ordered Plaintiffs to supplement the record[2] and took the matter under advisement. Plaintiffs submitted their Supplemental Brief with attached exhibits on December 29, 2000 and Defendants submitted their Reply to Plaintiffs' supplemental submission on January 12, 2001. Having reviewed and considered the parties' briefs, supporting documents, and the oral arguments of counsel, the Court is now prepared to rule on this matter. This Opinion and Order sets forth the Court's ruling.

## II. PERTINENT FACTS

Plaintiff Ronald Nelson has been employed by the City of Flint as a police officer since 1977. Plaintiff Michael Ferris has been a Flint police officer since 1986. In December 1994, Nelson and Ferris, along with 74 other Flint police officers took and passed the written examination for promotion to Sergeant.

The written examination is required under the Collective Bargaining Agreement entered into between the City of Flint and the Flint Police Officers Association. As provided in the CBA, an Eligibility List for promotions to Sergeant is compiled by ranking the candidates according to their test scores on the written examination. Article 38, Section 2 of the CBA sets forth the procedure for selecting eligible candidates from the List for promotion. This section provides, in pertinent part, as follows:

The City shall have the right to select among the top three (3) rank[ed] eligibles or from among all eligibles falling with three percentage (3%) points of the highest score certified, whichever produces the greatest of eligibles, plus all ties with the lowest score certified.

[CBA, Art. 38, § 2, Defendants' Ex. F; Plaintiffs' Ex. 12.]

This provision is commonly referred to as the "Rule of Three or Three Percent." Pursuant to this Rule, promotions can only be made from among those officers who are ranked among the top three candidates on the Eligibility List, or from among officers who were within three percentage points of the highest score that had been certified, if a greater number of candidates fell within this latter group (i.e., if more than three candidates fell within three percentage points of the highest certified score.) It is undisputed that the Rule of Three plus Three Percent was followed with respect to the 1996, 1997 and 1998 promotions at issue in this case.

Chief Hampton testified in his deposition that he decided who received the promotions at issue, but that he did not have final authority to establish employment policy for the Police Department. [See Hampton Dep. pp. 9–10]. He further testified that his discretion with respect to hirings, firings and promotions was limited by, among other things, the terms of the Collective Bargaining Agreement. [Hampton Dep. pp. 9–10; 38–39, Defendants' Ex. C][3]

2. The Court directed Plaintiff's counsel to provide foundational evidence to authenticate and establish the admissibility of Plaintiff's Ex. 19, which Plaintiff proffered as the City of Flint's Affirmative Action Plan in place at the time of the promotions in question. Specifically, the Court directed Plaintiff to provide evidence that Exhibit 19 (1) was an operative document that the City was working off at the time of the promotions; (2) that the City formally adopted it; and (3) that it applied to

the Police Department with respect to the promotions in question.

3. Hampton testified as follows:

Q: As the police chief for the City of Flint, do you have the power to hire and fire employees who work for you?

A: Yes, subject to provisions. But the answer is yes. Other provisions of city government.

*The October 6, 1996 Promotions*

Plaintiff Nelson was ranked 13th and Plaintiff Ferris was ranked 15th on the Eligibility List compiled from the December 1994 examination results, both having scored 91.23% on the exam. [*See* Defendants' Ex. D.] The top 11 candidates were promoted in 1995. These 1995 promotions are not at issue in this case. Thus by October 1996, the highest rank eligible was Deborah Bayer, a white female, who had a score of 92.68%. *Id.* Plaintiff Nelson was the second rank eligible, followed by Harold Payer, a white male, and Plaintiff Ferris, all three of whom scored 91.23%. There were a total of 15 candidates whose scores fell within three percentage points of the highest certified score, 92.68%. These candidates were as follows:

| Candidate | Rank on Eligibility List | Exam Score | Race and Gender |
|---|---|---|---|
| Deborah Bayer | 12 | 92.68 | White female |
| Ronald Nelson | 13 | 91.23 | White male |
| Harold Payer | 14 | 91.23 | White male |
| Michael Ferris | 15 | 91.23 | White male |
| Sharon Dunbar | 16 | 90.51 | White female |
| Terry Speedy | 17 | 90.51 | White male |
| Michael Coote | 18 | 90.51 | Hispanic male |
| James Peterson | 19 | 89.51 | White male |
| Timothy Murley | 20 | 89.06 | White male |
| Alan Wehrli | 21 | 88.33 | White male |
| Stephen Hill | 22 | 88.33 | White male |
| Gregory Doerr | 23 | 88.33 | White male |
| Michelle Marshke | 24 | 88.33 | White female |
| Mitchell Brown | 25 | 88.06 | White male |
| Scott Sutter | 26 | 87.61 | White male |

[*See* Defendants' Ex. D, G, and K.] [4]

There were four openings for Sergeant filled on October 6, 1996. Deborah Bayer, Harold Payer, Sharon Dunbar and Michael Coote received those four promotions. Plaintiff Nelson alleges that the promotions of Sharon Dunbar (a white female) and Michael Coote (a Hispanic male), who were ranked below him on the Eligibility List were based on gender and race. Plaintiff Ferris alleges that Sharon Dunbar's promotion was based on gender since she scored lower than he on the examination.[5] Neither Plaintiff challenges the pro-

Q: And with respect to hirings and promotions are you the sole decision maker with respect to hirings and promotions within the City of Flint Police Department?

A: I make initial recommendations [with respect to hirings and promotions] but I have to follow, you know, personnel rules and procedures as it relates to hiring and contractual obligations as it relates to discipline, terminations, etcetera.

\* \* \* \* \* \*

Q: ... [W]hen the certification pool is given to you, you have the discretion as to who to pick, correct?

A: The discretion is afforded me by the contract, but the contract also requires the process upon which I may use that discretion. So I follow the contract in my decision-making on this.

Q: Where in the contract does it tell you how to exercise your discretion?

A: The contract says the rule of three plus three percent, and that's the discretion that I must exercise....

[Hampton Dep. pp. 9–10, 38–39.]

4. Chief Hampton testified that when the list of certified candidates is presented to him, there is no indication on the list of the actual exam scores of the individuals. Rather, all that he is given is the name and rank. [*See* Hampton Dep. pp. 56–57.]

5. Ferris, who is Arab–American, admitted that he is *not* alleging reverse race discrimination with respect to the promotion of Mr. Coote, a Hispanic. [Ferris Dep. p. 33.]

motion of Deborah Bayer as she scored higher than both Plaintiffs. [*See* Nelson Dep. pp. 39–40 ("I didn't have a problem with [the promotion of Deborah Bayer.] She outscored me.") ]

Chief Hampton explained that once the pool of the top three percent of candidates is identified, in exercising his discretion with respect to deciding who should be promoted, he went to his captains and asked for their input as to who among these individuals would do the best job for the department. [Hampton Dep. pp. 24–25.] He testified that Sharon Dunbar was selected for a promotion because

> The captains' input on Sharon Dunbar, I can only give you a composite, because based on when we selected her for a promotion the input I received from the captains was positive, that she was a self-starter, a go-getter, someone who had developed a reputation in the department on—Stolen auto recovery was a specialty of hers, that she would keep up with the vehicle license plates and search of those plates, keep a listing and in her duties throughout the city she would find stolen autos at a higher level than anyone else in the department. So she was highly regarded as a police officer, an excellent police reports writer, someone who took their job very seriously and worked very hard.

*Id.* at pp. 16–17.

Hampton also recalled that one of his captains, Captain Peek "was highly vocal in a very positive way about [Michael] Coote in his candidacy.... I remember him being very positive about him putting him [in] 'a class of his own' kind of comment." *Id.* at 22.

*February 16, 1997 Promotions*

The same Eligibility List [Defendants' Ex. D] was used for the three promotions on February 1, 1997 given to Timothy Murley, a white male; Alan Wehrli, a white male; and Michelle Marshke, a white female. Plaintiffs do not challenge the promotions of either Murley or Wehrli as they, like Plaintiffs, are both white males. They do, however, challenge on the grounds of reverse sex discrimination the promotion of Michelle Marshke, notwithstanding that Ms. Marshke and Alan Wehrli, whose promotion they are not challenging, had identical scores on the sergeant's exam.

Chief Hampton testified that the captains' input on Michelle Marshke was nothing but positive:

> Q: What was their composite impression of Michelle Marshke?
>
> A: Very—an outstanding community police officer. We have a community policing program in Flint that's very important to the community and to the department. She represented that program with excellence. She was highly regarded by citizens and citizen groups. In fact, I had some level of difficulty pulling her away from that program even as a result of her leaving as a result of promotion.
>
> So, she was very—considered a very conscientious officer who worked very diligently with the community policing program. No negatives.

[Hampton Dep. pp. 17–18.]

Pursuant to the Collective Bargaining Agreement, an Eligibility List expires after two years. Therefore, in January 1998, a new Sergeant's examination was given and a new Eligibility List compiled from the results of that exam. [*See* Ex. E.] Nelson scored 83.95%, placing him 11th on the list. Ferris scored 81.84%, placing him 17th on the list. There were 18 Sergeant vacancies to be filled on May 3, 1998 which for purposes of filling them, were divided into eight "requisition" groups. [*See* Defendants' Ex. H.] Five promotions in three requisition groups

were made before Nelson was certified as among the top three percent. [*See* Defendants' Ex. H.] Nelson does not challenge these five promotions. When Nelson first became part of the certified eligibility pool, it was for the fourth requisition group. There were two vacancies to be filled in this group, and they were filled by the two candidates with the two highest scores on the Sergeant's exam. Nelson does not challenge these two promotions, either.

It is the promotions in the fifth, sixth and seventh requisition groups that Nelson challenges. The certified pool for the fifth requisition group, which was for six vacancies, consisted of the following individuals in rank order:

| Candidate | Rank on Eligibility List | Exam Score | Race and Gender |
|---|---|---|---|
| Lenual Smithwick | 8 | 85.00 | White male |
| Wendell Millstead | 9 | 85.00 | White male |
| Richard Hetherington | 10 | 85.00 | White male |
| Ronald Nelson | 11 | 83.95 | White male |
| Terry Speedy | 12 | 83.95 | White male |
| Timothy Idalski | 13 | 82.89 | White male |
| Jeffrey Mabry | 14 | 82.89 | Black male |
| Anthony Pittman | 15 | 82.89 | Black male |
| Greg Hosmer | 16 | 82.89 | White male |

[Defendants' Ex. E, H; Plaintiffs' Ex. 23.]

Smithwick, Hetherington, Speedy, Idalski, Mabry and Hosmer received the promotions. Nelson does not contest the promotions of Smithwick and Hetherington as they are both white and both scored higher on the exam than he did. Nor does Nelson contest the promotion of Speedy, another white male, whose score on the exam was the same as his. It is only promotion of Jeffrey Mabry, who is African American, that Plaintiff Nelson challenges. (He does not challenge the promotion of Greg Hosner, who is white, whose score on the exam was the same as Mabry's.)

The sixth requisition group on May 3, 1998 was for one vacancy. Officers Millstead, a white male who scored higher than Plaintiff, Plaintiff Nelson, and Anthony Pittman, a black male, made up the certified pool for this vacancy. Pittman received the promotion. Nelson contends Pittman was promoted instead of him because he is black.

The seventh requisition group on May 3, 1998 was for two vacancies. The certified pool for this group consisted of Millstead the highest ranked candidate, Plaintiff Nelson the second highest ranked candidate, Plaintiff Michael Ferris, who was ranked 17th with a score on the exam of 81.84%, and Darwyn Sparks, a white male who was ranked 18th also with a score of 81.84%.[6] Millstead and Plaintiff Nelson received the promotions. Thus, notwithstanding that Nelson was actually promoted on the same date as 15 other candidates who passed the January 1998 Sergeant's exam, (and ignoring that three of the white male candidates promoted before him scored lower than he did), Nelson challenges only the promotions of the two black male candidates, Mabry and Pittman, who were promoted before him *on that same date* who had lower exam scores than he did, as the product of reverse race discrimination. While Nelson acknowledges that, at present, he has suffered no damage as a result of being promoted later in the same day as Mabry and Pittman,

---

6. This was the first requisition group for which Plaintiff Ferris with a rank of 17 was certified as a candidate. Ferris does not challenge the promotions in this group.

Nelson's position is that he could nonetheless potentially be damaged as a result of being promoted later because, he alleges, the order of promotion "could possibly" have an impact in the future on shift preference and vacation picks if Mabry and Pittman were ever transferred into Nelson's bureau and happened to ask for the same shift or same vacation day as he. [Nelson Dep. pp. 49–50.] He also said that "hypothetically," if all three took the lieutenant's exam and were tied for a promotion, the tiebreaker would be "grade seniority" which is decided by the order of promotion. *Id.* at 50–51.

Chief Hampton testified that the overall composite report from the captains was that Pittman was "overall [a] competent, capable, hardworking officer," [Nelson Dep. p. 18.], and the overall impression of Officer Mabry was

No negatives. No disciplinary history. A defensive tactics instructor. A total recall kind of person. A guy who remembers everything. Just a very competent, very positive police officer. No negatives at all. No discipline history.

*Id.*, p. 20.

With respect to Plaintiff Ferris, as indicated, Ferris was not a certified candidate until the seventh requisition group on May 3, 1998. He did not get one of the two promotions available in that requisition group; as noted, they went to Wendell Millstead and Ronald Nelson, the two candidates (both white males) who scored higher than he did on the exam.

The eighth May 3, 1998 requisition group consisted of the following candidates in rank order:

| Candidate | Rank on Eligibility List | Exam Score | Race and Gender |
|---|---|---|---|
| Michael Ferris | 17 | 81.84 | White male |
| Darwyn Sparks | 18 | 81.84 | White male |
| James Grohoski | 19 | 81.84 | White male |
| Gerald Driggett | 20 | 80.79 | White male |
| Kenneth Engel | 21 | 80.79 | (unknown) |
| Daniel Allen | 22 | 80.79 | White male |
| Stephen Gale | 23 | 80.79 | White male |
| Rodney Williams | 24 | 79.74 | Black male |
| Cynthia Herfert | 20 | 78.74 | White female |

[Defendants' Ex. E, H; Plaintiffs' Ex. 23.]

Daniel Allen, a white male, and Rodney Williams, a black male, received the final two of the 18 May 3, 1998 promotions. Plaintiff Ferris contends that Rodney Williams' promotion was the result of reverse race discrimination. (He does not challenge the promotion of Daniel Allen, the white male candidate who also scored lower than he did on the exam.)[7] Ferris,

however, was promoted to sergeant a month later, on June 7, 1998.

Defendant Hampton testified that Williams was considered to be the best candidate among the certified eligibles in the eighth requisition group:

The only thing I can say about Officer Williams is that he got the support of the majority of the captains in the selection of two from that group. Informa-

---

7. Ferris claims that he was also discriminated against when the twelfth promotion was given to Jeffrey Mabry and the fourteenth promotion was given to Anthony Pittman, it is undisputed that Ferris was not part of any certified eligibility pool that contained either Mabry or Pittman. *See* Defendants' Ex. H. *See also*, Hampton Dep. pp. 90–91. Thus, the only non-white male candidate Ferris could have been "passed over" for was Rodney Williams.

tion that was discussed was all positive relative to Officer Williams that he didn't have a disciplinary history, that he was a self-starter. Everything was positive. I have no recollection of any negatives raised by any of the captains concerning this officer.

[Hampton Dep. pp. 76–77.]

*The Reasons Why Nelson Was Not Promoted Until May 3, 1998*

Chief Hampton testified that in contrast to the positive input he received from the captains regarding the female and minority sergeant candidates whose ultimate promotions Plaintiffs challenge in this action, the feedback regarding Plaintiff Nelson was not so positive. He testified that one of the main reasons Nelson was not promoted until May 3, 1998 was because he had an attitude problem. [Hampton Dep. pp. 91–92.] One incident which occurred on June 27, 1996 stood out in Hampton's mind—when Nelson lost his temper and threw a ticket book at his superior from across the room during roll call. *Id.* Plaintiff's superior, Lt. Gary Hagler wrote in his Report concerning the incident:

On Thursday 06–27–96 at approximately 1915 hrs. upon concluding roll-call, I asked Sergeants Moore and Brown if they had anything that they wanted to include. Both sergeants stated that they had nothing to add. At this time, I was standing at the front of the roll-call room near the desk that is located against the east wall of the room. I heard a voice that I recognized as Offi-

cer Nelson's stated "I have something to say." I turned to look in the direction of Officer Nelson at which time he threw a parking ticket book at me. This ticket book was not tossed in a[n] underhand fashion; it was thrown the way a subject would throw a frisbee, with substantial velocity. I was holding a clipboard in my right hand and my first reaction was to block the ticket book which was flying toward my upper chest or face area I brought up my left hand just in time to block the ticket book, and I luckily caught the ticket book before it struck me . . . .

[Defendants' Ex. Q] [8]

Chief Hampton testified that he viewed the ticket book incident as demonstrating poor attitude on the part of Nelson:

We're talking about attitude toward supervision and leadership. We're talking about being a member of the management team. We're talking about that attitude toward authority. We're in a chain of command structure. We're talking about attitude.

[Hampton Dep. pp. 93–94.]

*The Reasons Why Ferris Was Not Promoted Until June 7, 1998*

Hampton testified that the main reason Plaintiff Ferris was not promoted until June 7, 1998 was because of his carelessness and inability to follow rules, which he demonstrated throughout his career. [9] Three events, however, stood out in Hamp-

---

8. Nelson was also disciplined by his supervisors for other incidents. In July 1984, he was given a written warning for failing to follow an order from a dispatcher directing him to respond to a crime scene. He was also disciplined several times for misuse of radio communications. [Nelson Dep. pp. 61–62. *See also* Defendants' Ex. M–P.]

.9. During his employment as a police officer, Ferris was disciplined several times by his

supervisors. He was counseled for improperly handling drug evidence during a vehicle impound and was reprimanded for failing to appear for a hearing and for damaging a police vehicle after hitting a fire hydrant. *See* Ferris Dep. pp. 61, 64; Defendants' Ex. R–T. e also received several written warnings for being out of uniform before the end of his shift. [Ferris Dep. p. 61; Defendants' Ex. S.]

ton's mind with respect to Plaintiff Ferris's conduct.

One of these events was when Ferris was written up for his failure to make an arrest after breaking up a fight at approximately 2:00 a.m. in front a local bar. Ferris was off duty when he observed several men fighting. He jumped into the fight and in so doing, punched one of the men in the face. Ferris did not identify himself as a Flint police officer, did not effect any arrests, did not determine the identities of any of the men involved, and did not report the incident to any commanding officer. [*See* Hampton Dep. p. 13; Defendants' Ex. V, W]. Three of the men involved made assault complaints against Ferris. *Id.*

A second event was when during a routine search of a detainee at the police station, Ferris removed a suspect's handcuffs before completing the inventory of his possessions. The suspect grabbed a crack pipe which had been taken from his pocket, and smashed it on the floor, destroying the evidence collected. He then fought with the officers until he was restrained. *See* Defendants' Ex. X.

The third incident that Chief Hampton testified played an important part in his decisions prior to June 7, 1998 not to promote Plaintiff Ferris was when Ferris negligently left a cell door open, allowing a prisoner to escape. Hampton testified that he viewed this incident and the bar fight incident as very serious:

> Well, you have the fight issue and you have the prisoner issue. And the reason I—Those are the two that are most serious here, and that's because of the potential liabilities involved and the potential danger to the officer and others.

The fight issue clearly raises a liability problem for the city. Police officers don't go around having fistfights....

[Hampton Dep. p. 35.]

*The Bases of Plaintiffs' Claims of Reverse Race/Gender Discrimination*

As indicated, Plaintiffs each contend that they were the victims of reverse race and gender discrimination. Plaintiff Nelson claims that he was the victim of reverse sex discrimination as a result of the promotions of Sharon Dunbar in 1996 and Michelle Marshke in 1997. He also claims that he was the victim of reverse race discrimination as a result of the promotions of Michael Coote in 1996, and Jeffrey Mabry and Anthony Pittman in 1998. Plaintiff Ferris claims, like Plaintiff Nelson, that he was the victim of reverse sex discrimination as a result of the promotions of Sharon Dunbar in 1996 and Michelle Marshke in 1997, and the victim of reverse race discrimination as a result of the promotion of Rodney Williams in 1998.

As evidence of their claims of reverse race and sex discrimination, Plaintiffs rely upon their own testimony that they believe they each respectively was better qualified for the promotions than the persons who ultimately were promoted. They also claim that the City of Flint had an Affirmative Action Plan at some point in time in the past, which called for 50% of all applicant pools to include minorities and females, and a subsequent Plan which set as a goal for new hires in the police department 11.6% female hirees to be achieved by 1997. *See* Plaintiffs' Ex. 18 and 19.[10] Plaintiffs also rely upon the

---

**10.** It is undisputed that the Plan documents Plaintiffs rely upon were never produced during discovery. These two Exhibits (Exhibits 18 and 19) are undated and, as discussed *infra*, there is insufficient evidentiary foundation to establish their authenticity, or that Chief Hampton even knew about them,' let alone used them when making the promotion decisions involved in this case.

Affidavit of William Khouri, a Flint Police Department Lieutenant, who stated

    5.  In 1996, I saw a document authored by Chief Hampton lying on his secretary's desk. This document seemed to be a "mission statement" from Chief Hampton concerning employment decisions within the City of Flint Police Department.

    6.  The document stated the following: that one of Hampton's goals within the City of Flint Police Department was to hire, promote and retain minorities (African Americans and others) and females.

*See* Plaintiffs' Ex. 20.

Plaintiffs also rely on the fact that some female police officers filed a lawsuit alleging sex discrimination and harassment in 1984, i.e., 12 years before any of the events at issue in this case, and suggest that this lawsuit may have influenced the promotional decisions with respect to the two female officers promoted in 1996 and 1997.

Defendants claim that Plaintiffs' "evidence" is insufficient to withstand summary judgment on their reverse race and sex discrimination claims. Defendants further argue that Plaintiffs have failed to make out a legally cognizable Section 1983 claim against either Chief Hampton or the City of Flint.

### III. *DISCUSSION*

#### A. *STANDARDS APPLICABLE TO MOTIONS FOR SUMMARY JUDGMENT*

Summary judgment is proper " 'if the pleadings, depositions, answer to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact

and that the moving party is entitled to judgment as a matter of law.' " Fed. R.Civ.P. 56(c).

Three 1986 Supreme Court cases—*Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); and *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)—ushered in a "new era" in the standards of review for a summary judgment motion. These cases, in the aggregate, lowered the movant's burden on a summary judgment motion.[11] According to the *Celotex* Court,

> In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof.

*Celotex*, 477 U.S. at 322, 106 S.Ct. 2548.

After reviewing the above trilogy, the Sixth Circuit established a series of principles to be applied to motions for summary judgment. They are summarized as follows:

    \*  Cases involving state of mind issues are not necessarily inappropriate for summary judgment.

    \*  The movant must meet the initial burden of showing "the absence of a genuine issue of material fact" as to an essential element of the non-movant's case. This burden may be met by pointing out to the court that the respondent, having had sufficient opportunity for discovery, has no evidence to support an essential element of his or her case.

---

**11.** "Taken together the three cases signal to the lower courts that summary judgment can be relied upon more so than in the past to weed out frivolous lawsuits and avoid wasteful trials." 10A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice & Procedure*, § 2727, at 35 (1996 Supp.).

\* The respondent cannot rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact, but must "present affirmative evidence in order to defeat a properly supported motion for summary judgment."

\* The trial court no longer has the duty to search the entire record to establish that it is bereft of a genuine issue of material fact.

\* The trial court has more discretion than in the "old era" in evaluating the respondent's evidence. The respondent must "do more than simply show that there is some metaphysical doubt as to the material facts." Further, "[w]here the record taken as a whole could not lead a rational trier of fact to find" for the respondent, the motion should be granted. The trial court has at least some discretion to determine whether the respondent's claim is plausible.

*Betkerur v. Aultman Hospital Association,* 78 F.3d 1079, 1087 (6th Cir.1996). *See also, Street v. J.C. Bradford & Co.,* 886 F.2d 1472, 1479–80 (6th Cir.1989).

## C. *PLAINTIFFS HAVE FAILED TO MAKE OUT PRIMA FACIE CLAIMS OF REVERSE DISCRIMINATION*

It is well-established that the burden is on the employment discrimination plaintiff to establish a *prima facie* case of discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582 (6th Cir.1992). *Town v. Michigan Bell*

*Telephone Co.,* 455 Mich. 688, 568 N.W.2d 64 (1997); *Lytle v. Malady,* 456 Mich. 1, 27, 566 N.W.2d 582, 595 (1997).[12]

If the plaintiff successfully proves a *prima facie* case, the burden of persuasion shifts to the employer to articulate some legitimate, nondiscriminatory reason for the employment decision. *McDonnell Douglas, supra; Town v. Michigan Bell Telephone, supra.* Once the employer carries this burden, the burden shifts back to the plaintiff to prove by a preponderance of the evidence that the legitimate reasons offered by the employer were not its true reasons, but were a pretext for discrimination. *Burdine, supra,* 450 U.S. at 253, 101 S.Ct. 1089; *Town, supra.* the ultimate burden of persuasion, however, remains at all times with the plaintiff to prove discrimination. *St. Mary's Honor Center v. Hicks,* 509 U.S. 502, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993); *Town, supra; Lytle, supra.*

Under the *McDonnell Douglas/Burdine* framework, a plaintiff can establish a *prima facie* case of discrimination by showing that: (1) he was a member of a protected class, (2) he was subject to an adverse employment action, (3) he was qualified for the position, and (4) for the same or similar conduct he was treated differently than similarly-situated non-protected class employees. *Mitchell v. Toledo Hospital, supra,* 964 F.2d at 583; *Town v. Michigan Bell, supra; Lytle v. Malady, supra.*

Consistent with the United States Supreme Court's admonition that the generally-accepted *McDonnell Douglas/Burdine* test for establishing a *prima facie* case of discrimination should be modified to accommodate different employment discrimination contexts,[13] the Sixth Circuit has

---

**12.** The elements of a cause of action of reverse race discrimination under Elliott–Larsen and Title VII are also the elements required to establish a reverse race discrimination claim under Section 1983.

*See, Gutzwiller v. Fenik,* 860 F.2d 1317, 1325 (6th Cir.1988).

**13.** *See, McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 1824 n. 13, 36 L.Ed.2d 668 (1973).

adopted a test which adds an additional element to the *McDonnell Douglas* paradigm in cases such as this one involving claims of "reverse" discrimination. *See Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796, 801 (6th Cir.1994). Under the Sixth Circuit's reverse discrimination framework, the reverse discrimination plaintiff must show that "background circumstances support the suspicion that the defendant is that unusual employer who discriminates against the majority" in addition to showing that similarly-situated non-protected class employees were treated differently. *Id. See also, Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir.1985) (reverse race discrimination claim). The Michigan Court of Appeals has also held that this "heightened" standard of proof is also applicable in reverse discrimination cases brought under the Michigan Elliott–Larsen Civil Rights Act. *Allen v. Comprehensive Health Services*, 222 Mich.App. 426, 432–33, 564 N.W.2d 914 (1997), *appeal granted*, 459 Mich. 861, 584 N.W.2d 922 (1998).[14]

Although neither the Sixth Circuit nor the Michigan Court of Appeals has provided a precise description of what a plaintiff must prove to establish "background circumstances" essential to a reverse discrimination claim, the Michigan Court of Appeals did cite number of examples of what would constitute such special circumstances in *Allen:*

For cases in which plaintiffs did establish this first element of their reverse discrimination cases, *see, e.g., Reynolds v. School Dist. No. 1*, 69 F.3d 1523 (10th Cir.1995) (the plaintiff was the only white employee in an otherwise all-Hispanic department and Hispanic supervisors made most employment decisions); *Bishopp v. District of Columbia*, 788 F.2d 781 (D.C.Cir.1986) (the defendant promoted less qualified minority employee; use of subjective rather than objective criteria; internal and external pressure to favor minorities); *Lanphear v. Prokop*, 703 F.2d 1311 (D.C.Cir.1983) (qualified white passed over for black whose qualifications were not fully checked; pressure to increase minority percentages). We ... cite [these Title VII] cases to illustrate the kind of evidence plaintiff might have brought forward, if it had been available, to satisfy the first element of his prima facie case. 222 Mich.App. at 434, n. 6, 564 N.W.2d 914. *See also, Murray v. Thistledown Racing, supra*, 770 F.2d at 68.

Plaintiffs here have failed to establish such "background circumstances" showing that the City of Flint is that unusual employer who discriminates against the majority. Of significance in this case is the race and sex of the vast majority of the 25 individuals promoted to Sergeant in 1996–1998. Eighteen of the individuals promoted were white males, one was Hispanic, three were African–American, and three were women. Clearly, the hiring statistics do not support an inference that the City discriminates against the majority in its promotion practices.

As evidence of background circumstances, Plaintiffs point to the purported 1994 Flint Affirmative Action Plan attached to their Response Brief as Exhibits

---

**14.** Plaintiffs have argued that theirs is a case of "direct" discrimination rendering it unnecessary for them to satisfy the *McDonnell Douglas/Burdine* requirements. They predicate their argument on what they have proffered as the 1994 Affirmative Action Plan (Plaintiff's Exhibit 19; Supplemental Exhibit 5). Because, as discussed *infra*, the Court finds insufficient foundational evidence to support Plaintiffs' proffered Exhibit 19, the Court finds no evidentiary basis for Plaintiffs' claim of "direct discrimination." Therefore, the Court will analyze Plaintiffs' reverse discrimination claims under the modified *McDonnell Douglas/Burdine* framework.

19.[15] However, as noted above, this document was never produced *by either party* during discovery and Plaintiffs established no foundation for it to be deemed admissible evidence prior to the December 14, 2000 hearing.[16] The Court, however, afforded Plaintiffs the opportunity to do so following the hearing. The Court has reviewed Plaintiffs' Supplemental Brief and supporting exhibits and finds that Plaintiffs have failed to cure the foundational deficiencies in Exhibit 19 noted by the Court at the hearing. Specifically, the Court advised Plaintiffs that in order for the Court to consider Exhibit 19, they would have to establish an evidentiary foundation authenticating the Plan and show that it was operative in 1996 and 1997; that the City formally adopted the Plan; and that it applied to the Flint Police Department and to Chief Hampton. [*See* 12/14/00 Hearing Transcript, pp. 27–31.] Plaintiffs, however, have failed to do so.

■ Plaintiffs attempt to authenticate the 1994 Plan by arguing that it was produced by the City of Flint in response to discovery requests in another case, *Hall v. City of Flint,* 97–CV–60349–AA. However, Plaintiffs have presented only *undated* and *unsigned* responses to discovery requests in that case (*see* Plaintiffs' Supplemental Ex. 3).[17] Unsigned discovery responses, without supplemental authentication, are inadmissible as evidence

for purposes of Fed. R. Civ. Pro. 56. *See Simmons v. Hoegh Lines,* 784 F.2d 1234, 1238 (5th Cir.1986). *See also, EEOC v. Clay Printing Co.,* 955 F.2d 936, 945 & n. 9 (4th Cir.1992); *Garside v. Osco Drug, Inc.,* 895 F.2d 46, 49–50 (1st Cir.1990). Plaintiffs simply have produced no evidence to establish that the Plan at Exhibit 19 was ever formally adopted by the City of Flint.

Further, Plaintiffs have offered absolutely *nothing* to establish that the Plan was operative during the relevant time period. Essentially, all that Plaintiffs have done is re-state what their counsel argued at the December 14 hearing: that the document should be allowed to speak for itself. In support of this contention, Plaintiffs point to the content of the document where, at Section IV, the Plan states that charts 1–22 provide a breakdown of the City's workforce composition as of 12/1/94. From this, Plaintiffs ask the Court to surmise the Plan took effect in 1994. Not only does this require a leap of reasoning, but more importantly, charts 1–22 do not include the Police Department—the Police Department's workforce is set forth in a two-page separate chart which has no date.

Plaintiffs also point to the "target date" of 1997 for correcting the underutilization of minorities and females in certain categories. From these two dates—the only two

15. Plaintiffs originally also relied upon an earlier Plan (Plaintiffs' Ex. 18; Supplemental Ex. 4) purportedly put into effect in 1985. However, at oral argument, Plaintiffs conceded that this earlier Plan had expired long before any of the promotions at issue occurred.

16. The same is true of Lieutenant William Khouri's Affidavit regarding a document that he claims he saw on the Chief's secretary's desk at some unspecified point in time in 1996 that seemed to be a "mission statement" of the Chief which Khouri claims said that

one of the Chief's goals was to hire, promote and retain minorities. No such document, however, was ever produced in this case and Khouri's affidavit testimony about what it allegedly said is clearly hearsay in the absence of any foundation to establish that this document was made or adopted by the Defendants.

17. Indeed, Plaintiffs have not even provided the unsigned signature page of the responses, even after this Court had previously admonished their counsel for not attaching complete documents to their original brief.

dates appearing anywhere in Exhibit 19— Plaintiffs ask the Court to infer that the Plan was in effect from 1994 to 1997. However, all that is self-evident from the document is that statistics from 1994 are addressed and a target date for accomplishing a goal of increased minority and female representation in the workforce is set as 1997. Plaintiffs have provided no independent supplementary information to substantiate their argument that because the document refers to a 1994 utilization analysis and an unspecific target date in 1997, it must have been effect during that time period. This is simply insufficient to establish an evidentiary foundation.

■ However, even if Plaintiffs could establish an evidentiary foundation, there is insufficient evidence presented in the Plan from which to infer preferential treatment to females and minorities in the Police Sergeant promotions in 1996–1998. First of all, with respect to race discrimination, the Plan itself states that there is no underutilization of Blacks; in fact, Blacks are over-represented in the Police Department workforce by 36.7%. [*See* Plaintiffs' Supplemental Ex. 5, Section VI, EEO Police Chart, p. 2.] Hence, there is no "goal" to achieve with respect to Blacks. *Id.*, Section VI. With respect to females, the Plan states only that the City has set as a "goal" an 11.6% increase in female representation in the Police Department. Nothing is stated at all with respect to promotions to Sergeant. Furthermore, as the Sixth Circuit observed in *Middleton v. City of Flint*, 92 F.3d 396, 404 n. 5 (6th Cir.1996), there is a vital distinction between "goals" and "quotas," and affirmative action plans which do not provide for preferences or quotas are not illegal.

In the "Flint Police Department Utilization Analysis" in Section VI of the Plan in question here, there are no quotas or preferences set forth which might cause the Plan to be suspect, nor, as indicated above, are there any references to promotions to Sergeant. Moreover, the Mayor's (undated) Commitment Statement at the beginning of the document makes no reference to preferential treatment; rather it specifies that the Plan's purpose is to make employment decisions based upon merit rather than considerations based on race, gender, age, etc.

In sum, Plaintiffs have not established sufficient background circumstances to show that the City of Flint discriminates against white males.

■ Assuming *arguendo* that Plaintiffs have established sufficient background circumstances to satisfy the requirements of *Pierce* and *Allen*, Plaintiffs nonetheless have failed to establish that the minority and female candidates were sufficiently "similarly situated" to them so as to make out a comparison of their treatment to treatment afforded these other sergeant candidates. As the Sixth Circuit explained in *Mitchell v. Toledo Hospital*,

It is fundamental that to make a comparison of a discrimination plaintiff's treatment to that of non-minority employees, the plaintiff must show that the "comparables" are similarly situated *in all respects*. *Stotts v. Memphis Fire Department*, 858 F.2d 289 (6th Cir.1988). Thus, to be deemed "similarly-situated", the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards *and have engaged in the same conduct* without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it. *Mazzella v. RCA Global Communications, Inc.*, 642 F.Supp. 1531 (S.D.N.Y.1986), *aff'd*, 814 F.2d 653 (2d Cir.1987); *Lanear v. Safeway Grocery*, 843 F.2d 298 (8th Cir.

1988) (plaintiff must prove that he and the white employee were similarly situated in all respects *and that the other employee's acts were of comparable seriousness to his own*); *Cox v. Electronic Data Systems Corp.*, 751 F.Supp. 680 (E.D.Mich.1990).

964 F.2d at 583 (some emphasis added.)

Chief Nelson testified that both Nelson and Ferris had exhibited certain behavior in the past that none of the other candidates had exhibited. As indicated, Nelson had a serious attitude and temper problem and Ferris had several incidents of carelessness/negligence. None of the minority or female candidates who were promoted before Nelson and Ferris had similar prior problems.

D. *DEFENDANTS ARE ALSO ENTITLED TO SUMMARY JUDGMENT ON PLAINTIFFS' SECTION 1983 CLAIMS AGAINST THE CITY AND CHIEF HAMPTION*

42 U.S.C. § 1983 provides:

Every person who, under color of any statute, ordinance, regulation, custom, or usage of any State or Territory of the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress ....

■ However, a state official sued in his official capacity is not a "person" within the meaning of § 1983. *Whittington v. Milby*, 928 F.2d 188, 193 (6th Cir.1991); *Wells v. Brown*, 891 F.2d 591 (6th Cir. 1989).

■ It is well-settled in this Circuit that, absent a clear indication that Section 1983 defendants are being in their individual capacities, courts must assume that they are being sued in their official capacities, only. *See Whittington v. Milby, supra; Wells v. Brown, supra.* As the *Wells* court explained,

[T]he face of a complaint must indicate whether a plaintiff seeks to recover damages from the defendants directly.... *See Nix [v. Norman]*, 879 F.2d [429,] 431 [ (8th Cir.1989) ] (individual capacity suits must be clear enough to notify defendant of the personal nature of the suit). Although modern pleading is less rigid than in an earlier day, *see Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99 101–02, 2 L.Ed.2d 80 (1957), we have not let down all pleading barriers. It is not too much to ask that if a person or entity is to be subject to suit, the person or entity should be properly named and clearly notified of the potential for payment of damages individually. *Brandon v. Holt*, 469 U.S. 464, 474, 105 S.Ct. 873, 879, 83 L.Ed.2d 878 (1985) (Burger, C.J., concurring in the judgment).

891 F.2d at 593.

In this case, Plaintiffs did not designate in the caption their Complaint in what capacity they are suing Defendant Hampton. Further, there is no indication in the text of their Complaint that they are suing the Chief in his individual capacity. Therefore, Plaintiffs' Section 1983 claim against Defendant Hampton must be evaluated under the standards applicable to the public entity he represents, i.e., the City of Flint.

■ The Supreme Court has held that "[municipal liability [under § 1983] attaches only where the decision maker possesses final authority to establish municipal policy with respect to the action ordered.]" *Pembaur v. City of Cincinnati*, 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986). Mere authority to exercise discretion while performing par-

ticular functions does not make a municipal employee a final policymaker unless the official's decisions are final and unreviewable and are not constrained by the official policies of superior officials. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127, 108 S.Ct. 915, 926, 99 L.Ed.2d 107 (1988).

This issue was made clear in *Pembaur, supra*, where the Court emphasized the critical distinction between a municipal official with final *policy making* authority and one with the authority to make final *implementing* decisions in the employment setting:

> Thus, for example, the County Sheriff may have discretion to hire and fire employees without also being the county official for establishing county employment policy. If this were the case, the Sheriff's decisions respecting employment would not give rise to municipal liability, although similar decisions with respect to law enforcement practices, over which the Sheriff is the official policy maker, *would* give rise to municipal liability. Instead, if the county employment policy was set by the Board of County Commissioners, only that body's decisions would provide a basis for county liability. This would be true even if the Board left the Sheriff discretion to hire and fire employees and the Sheriff exercised that discretion in an unconstitutional manner; the decision to act unlawfully would not be decision of the Board.

*Pembaur, supra*, 475 U.S. at 483, n. 12, 106 S.Ct. at 1300, n. 12.

Following *Pembaur*, Circuit Courts of Appeal have similarly held that a municipality cannot be liable under Section 1983 for the discretionary employment decisions made by its police chief. *See, e.g., Crowley v. Prince George's County, Maryland*, 890 F.2d 683 (4th Cir.1989), *aff'd*, 946 F.2d 884 (1991). In *Crowley*, the county police chief

downgraded the plaintiff's position resulting in a significant salary reduction The plaintiff alleged that the downgrading was in retaliation for his drawing attention to racial harassment by the police department and because of race discrimination. The Fourth Circuit, reviewing the final policy making requirements of *Pembaur*, held that the police chief was not a final policy making official with respect to employment decisions even though he had discretion to implement the county's personnel policies, and therefore, the county could not be held liable as a matter of law. *See also, Greensboro Professional Firefighters Ass'n v. City of Greensboro*, 64 F.3d 962 (4th Cir.1995).

In the *Greensboro* case, the plaintiff alleged that the fire chief's refusal to promote him based upon his union activity violated his First Amendment rights. The appellate court affirmed the district court's grant of summary judgment, holding that the fire chief did not have final policy making authority over promotional policies since he merely had the discretion to hire and fire, not to create an overall employment policy:

> [Plaintiffs] contend that 'policy making' authority over promotional procedures in the fire department was vested in the fire chief because the fire chief had final decision making authority to appoint captains. While it is true that Fire Chief Jones had the authority to select a particular individual for promotion and even to design the procedures governing the promotions within his department, this authority did not include responsibility for establishing substantive personnel policy governing the exercise of his authority. His power to appoint and to establish procedures for making appointments was always subject to parameters established by the City. Appellants confuse the authority to make final

policy with the authority to make final implementing decisions.

64 F.3d at 965–66. *See also DeGuiseppe v. Village of Bellwood,* 68 F.3d 187, 190 (7th Cir.1995).

 In the instant case, Chief Hampton's deposition testimony makes clear that he does not have final policy making authority for substantive municipal personnel policies:

Q: As the police chief for the City of Flint, do you have to power to hire and fire employees who work for you?

A: Yes, subject to other provisions. But the answer is yes. Other provisions of City government....

... I make the initial recommendations, but I have to follow, you know, personnel rules and procedures as it relates to hiring and contractual obligations....

Hampton Dep. pp. 9–10.

Consequently, Plaintiffs' Section 1983 claims will be dismissed because Chief Hampton did not have final policy making authority for substantive municipal personnel policies. He may well have had, as Plaintiffs argue "implementing" authority, however, under Supreme Court precedent, this is insufficient to establish municipal liability predicated upon the Chief's actions with respect to the promotion decisions at issue in this case.

### CONCLUSION

For all of the foregoing reasons,

IT IS HEREBY ORDERED that Defendants' Motion for Summary Judgment be, and hereby is, GRANTED, and Plaintiffs' Complaint is accordingly, DISMISSED, in its entirety, with prejudice.